IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

Arnold G. Phillips, M.D.,          )
           )
Plaintiff            )
           )
v.            )
           )
Cecilia Abundis in her individual capacity as an employee and/or )   23-cv-00490
agent of the Illinois Division of Professional Regulation and/or )
the Illinois Department of Financial and Professional Regulation, )   Honorable Judge
           )   John Robert Blakey
David Igasaki in his individual capacity as a former employee and/ )
or agent of the Illinois Division of Professional Regulation and/or )
the Illinois Department of Financial and Professional Regulation, )
           )
Laura Forester in her individual capacity as an employee and/or )
agent of the Illinois Division of Professional Regulation and/or )
the Illinois Department of Financial and Professional Regulation, )
           )
Mark Thompson in his individual capacity as an employee and/or )
agent of the Illinois Division of Professional Regulation and/or )
the Illinois Department of Financial and Professional Regulation, )
           )
Peter M.C. Hofmann, M.D. in his individual capacity as a current )
or former employee and/or agent of the Illinois Division of )
Professional Regulation and/or the Illinois Department of )
Financial and Professional Regulation, )
           )
Defendants.            )

RECEIVED
KG
6/21/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## AMENDED COMPLAINT

NOW COMES the Plaintiff, Arnold G. Phillips, M.D., *pro se*, and complains of Defendants Cecilia

Abundis, David Igasaki, Laura Forester, Mark Thompson, and Peter M.C. Hofmann, M.D. in their individual

capacities as employees and/or agents of the Illinois Division of Professional Regulation (DPR) and the Illinois

Department of Financial and Professional Regulation (IDFPR).

### INTRODUCTION

1.      The standard of procedural due process is Notice. Before the deprivation of a protected property

interest, notice, and an opportunity to be heard are imperative: *Loudermill*, 470 U.S. at 542 (1985); and, Ziner-

mon *v. Burch*, 494 U.S. 113, 127 (1990). Dr. Phillips was again denied those rights when the Defendants

retained inactivation of his medical license without notice or hearing. Indeed, the Illinois Medical Disciplinary

Board has failed to respond to my letter requesting petitioning the Board for medical license restoration. See Exhibit A.

## JURISDICTION AND VENUE

2.  This action arises under the Fourteenth Amendment to the United States Constitution and federal Statutes 42 U.S.C. §§ 1983 and 1988. The Court has subject matter jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343.

3.  Jurisdiction further exists under the Declaratory Judgment Act. 28 U.S.C. § 2201.

4.  Venue exists in the Northern District of Illinois under 28 U.S.C. § 1391 as the events occurred in Chicago, Illinois and Dr. Phillips resides in this judicial district.

5.  Jurisdiction further exists because of diversity as follows. Exhibit D shows that patient DH received Tc-99M Oxidronate (HDP) from Mallinckrodt as one intravenous dose. This is one of the fundamental aspects, *sine qua non* of a Nuclear Medicine Bone Scan. Tc-99M is Technetium-99metastable and is radio-active with a half-life of six hours. After ten half lives, sixty hours with this isotope, any isotope is undetect-able according to the laws of physics and math. The precursor radioactive material is Molybdenum-99, and Mo-99 is radioactive. Mo-99 is imported into the U.S.A. from nuclear reactors in Chalk River, Ontario, Canada and also from the Netherlands. When Mo-99 decays into Tc-99m while at certain U.S.A. locations such as in Massachusetts, it is chemically attached to HDP. It is now ready for human, patient use as a drug. It is regulated in the U.S.A. by the Food and Drug Administration and the Nuclear Regulatory Commission under Congressional authority, see Exhibit H, in 21 U.S.C./

and, 353(h)(1);
and, 353(h)(2)(A)(i);
and, 353(h)(2)(A)(ii);
and, 353(h)(2)(B);
and, 310.3(n).

## THE PARTIES

5.  Plaintiff Arnold G. Phillips is a medical doctor residing in the State of Illinois.

6.  Defendant Cecilia Abundis is the current director of the Illinois Division of Professional Regula-tion, DPR, of the Illinois Department of Financial and Professional Regulation, IDFPR, and acted within the

scope of her employment with DPR and under color of State law.

7.     Defendant David Igasaki was a State Staff Attorney formerly employed by the Illinois Department of Financial and Professional Regulation and acted within the scope of his employment with IDFPR and under color of State law.

8.     Defendant Laura Forester is an attorney and was employed as Chief of Medical Prosecutions by The Illinois Division of Professional Regulation of the Illinois Department of Financial and Professional Regulation and was the supervisor of David Igasaki and acted within the scope of her employment with DPR and under color of State law.

9.     Defendant Mark Thompson is an attorney employed by the Illinois Department of Financial and Professional Regulation as a Deputy General Counsel, one of four, and the supervisor of Laura Forester and David Igasaki and acted within the scope of his employment with IDFPR and under color of State law.

10.     Defendant Dr. Peter M.C. Hofmann is a medical doctor employed and/or retained by the Illinois Division of Professional Regulation as Chairman of the Illinois Medical Disciplinary Board and acted within the scope of his employment and/or retention and/or as an agent within the DPR of the IDFPR and under color of State law.

## FACTS

11.     Arnold G. Phillips is a medical doctor residing in Illinois. Dr. Phillips satisfactorily completed an internship at University Hospitals of Cleveland, Ohio, and a full Nuclear Medicine Residency at the Veterans Administration Hospital/Loyola University, Hines, Illinois.

12.     Dr. Phillips held Illinois Medical License No. 036076706  and Radioactive Materials (RAM) License No. 860129122.

13.     Dr. Phillips practiced Nuclear Medicine in Naperville, Illinois. His patients were obtained by voluntary referral from healthcare practitioners.

14.     Dr. Phillips owned his equipment and no one else had any share in his equipment.

15.     Dr. Phillips did not participate in any insurance schemes, such as HMOs. He was never under

contract with any insurance company or any other organization.

16.     If a patient had been injured, *e.g.*, in a car crash, and had no money to pay his or her bill, Dr. Phillips would assert a "Physicians' Lien" with a proviso that the full bill would be paid if a settlement or adjudication had been reached.

17.     All patients were presented with a "Fee Disclosure Agreement" to understand the services to be performed, and to sign and date this "Fee Disclosure Agreement" before any medical services were performed.

18.     On June 17, 2008, patient DH presented at the Nuclear Medicine practice of Dr. Arnold G. Phillips in Naperville for performance of a Nuclear Medicine Bone Scan on referral from Dr. Garth Edwards.

19.     A "Limited History and Physical Exam" was performed for patient DH to determine if a Nuclear Medicine Bone Scan was needed.

20.     A prescription radioactive pharmaceutical, which had to be given intravenously, was necessary to perform a Nuclear Medicine Bone Scan.

21.     All prescription items require reasons for using them. These reasons are obtained by performing a history and physical exam as was done for patient DH.

22.     One, and only one, dose of a radioactive pharmaceutical was ordered and received from Mallinckrodt Radiopharmacy for patient DH. One and only one dose was intravenously injected for patient DH. There was one and only one test performed. See Exhibit D.

23.     I billed patient DH and her Blue Cross - Blue Shield health insurance company for one, and only one, dose for a radioactive pharmaceutical for one test for patient DH to be given intravenously

24.     No pills, absolutely none, for a radioactive Nuclear Medicine Bone Scan dose were supplied to Dr. Phillips by any radiopharmacy from anywhere. Dr. Phillips never gave patient DH any pills for a radioactive Nuclear Bone Scan test.

25.     Dr. Phillips never billed patient DH or Blue Cross - Blue Shield or any insurance company or any organization for pills of a radioactive or nonradioactive pharmaceutical to be used for a Nuclear Medicine Bone Scan for DH. See Exhibit D.

4

26.    I had completed the Blue Cross Blue Shield claim forms for Nuclear Medicine services which I had performed for DH. I had sent my completed standard claim forms directly to Blue Cross Blue Shield.

27.    The background fact is that Citizen-Internet Complainant DH tried to pocket her Blue Cross Blue Shield insurance payout check which was sent to DH by Blue Cross Blue Shield to be used to partly pay me for medical services which I had provided for her.

28.    DH refused to send me the Blue Cross Blue Shield payout check. As this is not the way things work, I retained attorney Michael R. Naughton to collect her bill. DH thereby not only wanted free medical services from me, but she also wanted to pocket insurance payout money.

29.    I then had administrative proceedings wrongfully brought against me by David Igasaki who was a State of Illinois Staff Attorney as his job title has been correctly described on Page 1, Doc. 46 of the Opinion in the U.S. Court of Appeals, 7th Circuit, case No. 18-3351.

30.    The administrative proceedings against me were initiated after Complainant DH had telephoned the office of the Illinois Attorney General, IAG. The IAG intake person told DH that she did not know how to handle the call, and that DH should call the Illinois Division of Professional Regulation, DPR, of the Illinois Department of Financial and Professional Regulation, IDFPR.

31.    The DPR intake person told DH to file a Citizen-Internet complaint. And, DH did this. The DPR intake Attorney was David Igasaki, who was a State Staff Attorney.

32.    It was after DH tried to pocket her Blue Cross Blue Shield payout that she contacted the DPR.

33.    Mr. Igasaki brought DH's Complaint before an Administrative Law Judge, ALJ.

34.    When patient DH stated under oath for the record as taken by a licensed Court Reporter paid by the Illinois Department of Financial and Professional Regulation before an Administrative Law Judge, that Dr. Phillips had given her pills for performing a Nuclear Medicine Bone Scan, Mr. Igasaki did not drop his case.

35.    When patient DH was again asked the same question about pills, she gave the same untruthful and wrong answer about the most fundamental aspect of her case: that I had given her pills for a Nuclear Medicine Bone Scan.

36.     It is fact that Mr. Igasaki had my written Nuclear Medicine Consultation Report for DH in his possession at all times.

37.     The Nuclear Medicine Consultation Report for DH clearly states that the Nuclear Medicine Bone Scan dose was given to patient DH intravenously.

38.     Neither the United States Food and Drug Administration nor the United States Nuclear Regulatory Commission have approved any pills whatsoever, radioactive or not radioactive, for oral use in obtaining a Nuclear Medicine Bone Scan. In fact, no such oral dose for use in obtaining a Nuclear Medicine Bone Scan exists anywhere on this planet except in the imaginations of DH and Mr. David Igasaki.

39.     It is a fact that Mr. Igasaki did not understand what he was talking about. Mr. Igasaki still did not drop his case even after DH gave the same untruthful and wrong answer about the most fundamental aspect of her case for the second time.

40.     Ms. Laura Forester, who was Mr. Igasaki's supervisor and Mr. Mark Thompson who was Ms. Forester's supervisor, allowed and enabled Mr. Igasaki to continue his case using incorrect and false information of the most fundamental nature.

41.     Where is justice here? Or even a tiny bit of justice when a licensed healthcare practitioner cannot comply and comport with the laws, rules, and regulations of the U.S.A. as administered under U.S. Congressional authority because a State staff attorney is more interested in bed bugs, or sleeping in his work cubicle, or reading a newspaper in his work area as is clearly written in the State's own "Appeal Defense Brief", Doc. 33, of 7th Circuit Case No. 18-3351?

See:    (a)  Exhibit E, Page 2 of Doc. 46 of 7th Circuit No. 18-3351, Lines 2, 6-8,15-18, 25-28, 30-31;
             referencing concerns and ratings of Mr. Igasaki's job knowledge and work product as poor;
             produced low-quality complaints and continued to fall asleep during work hours";

        (b)  Exhibit F, Page 3 of Doc. 46 of 7th Circuit No. 18-3351, Lines 4-5, 15-18, 25-27, referencing
             concerns that Mr. Igasaki "demonstrated a lack of knowledge on how to acquire experts,
             produced low quality complaints, and fell asleep during work hours";

(c) Exhibit G, Page 4 of Doc. 46 of 7th Circuit No. 18-3351, Lines 15-16. Termination of Mr. Igasaki by the IDFPR.

42. It is fact that in the State administrative hearings against me, you will find items, as listed below, which are egregious, ongoing, and were allowed and enabled to be perpetrated against me by specific Individual State Agency employees particularly by State Staff Attorney David Igasaki as enabled by Ms. Laura Forester, who was Mr. Igasaki's supervisor, and Mr. Mark Thompson, who was Ms. Forester's supervisor:

- withholding of evidence;

- concealment of evidence, *e.g.*, misstating or omitting laws and standard practices regarding the requirement of reason(s) for writing a prescription for patient care and patient use as in the Illinois Medical Practice Act;

- falsified or manufactured evidence;

- a requirement that I act outside of Federal and State laws;

- asserting as facts items which are not in evidence;

- interfering with Plaintiff's Constitutional rights; and,

- incorrectly vouching for the credibility of a witness.

43. I was then wrongfully punished by the ALJ, Bill G. Laskaris, who was a former State prosecutor, with a reprimand and fine of $10,000. as this was the subsequently-imposed higher amount of money, a tax, because I had contested the ALJ's decisions. I was not allowed to defend myself as to the increased fine.

44. I was unable to pay this increased fine because my Medical License, No. 036076706, had been twice wrongfully inactivated by Individual State Agency employees, employed within the DPR/IDFPR, without notice or hearing, for failure to pay the administratively-imposed fine. As stated, I was given no possibility to defend myself against the increased fine. And, I had no means of earning a living.

45. It is a fact that my Nuclear License, Radioactive Materials License or RAM No. 860129122, thereby could not be renewed because it requires a medical license to obtain and use prescription radioactive

pharmaceuticals.

46.     225 ILCS 85/ the Illinois Pharmacy Practice Act, states, "Prescription" means and includes any written, oral, facsimile, or electronically transmitted order for drugs or medical devices issued by a physician..."

47.     On December 7, 2016, I filed a *pro se* 42 U.S.C. Section 1983 lawsuit, No. 16-cv-11157, in the U.S. District Court, Chicago, because the State had given me no notice or a hearing regarding their wrongful inactivation of my medical license, No. 036076706, in 2014 and subsequently again in 2017 contrary to U.S. Constitutional protections and State Laws while also seizing, and keeping to this day, my two medical license renewal fees payments each time without notice.

48.     I filed No. 16-cv-11157 against certain named, captioned malfeasant State Agency employees.

49.     Because I did not name the captioned Individual State Agency Defendants with enough clarity as individuals, 16-cv-11157 was dismissed with prejudice.

50.     I appealed to the 7th Circuit in a *pro se* Appeal Brief and a *pro se* Oral Argument in 7th Circuit No. 17-2607.

51.     16-cv-11157 was reversed and remanded on appeal.

52.     7th Circuit No. 17-2607 was argued on February 27, 2018 and decided on April 12, 2018.

53.     The State was taxed for costs.

54.     The State filed a "Motion for Reconsideration" regarding the taxed costs. I responded by stating that the case had been briefed and argued by the parties and the Appellate Court had made its decision. I asked that the honorable Appellate Court uphold its decision, and it did.

55.     However, without notice, the Illinois Comptroller seized the money awarded to me for costs to pay down the administratively-imposed and increased fine.

56.     State law was subsequently amended regarding notification of the medical licensee of license changes and is thereby now consistent with the United States Constitution. But it is a fact that, in practice, this is still not happening. See Exhibit A, Pages 1 and 2.

57.     The Pacer version of my "Amended Complaint" in 16-cv-11157 is Doc. 71 and dated August 29, 2018.

It was filed after the reversal and remand by the 7th Circuit. The following three present or former IDFPR employees, all Defendants in 23-cv-00490, are: David Igasaki, IDPR former State Staff Attorney; Laura Forester, DPR former Chief of Medical Prosecutions; and, Mark Thompson, one of four deputy Counsels of the IDFPR and Ms. Forester's supervisor. Igasaki, Forester, and Thompson are not named or captioned in the "Amended Complaint" of 16-cv-11157.

58.     Mr. David Igasaki is responsible for the Order in 16-cv-11157. See Exhibit B, Pages 1-5.

59.     Arnold G. Phillips signed the "Settlement and General Release" in 16-cv-11157. In signing this, I understood it to pertain only to my lawsuit before the U.S. District Court, namely 16-cv-11157 and the Constitutional issues related to this case, *i.e.,* medical license inactivation without notice or hearing. These were the matters before the U.S. Court of Appeals for the 7th Circuit and subsequently resulted in changes in Illinois law in 2019. The "Settlement and General Release" should not deprive me of my Constitutional and foundational rights of access to the U.S. federal Courts. For example, the practice of Nuclear Medicine in the U.S.A. means that radioactive pharmaceuticals for patient care and use are obtained from a radiopharmacy. It is fact that components of these radioactive pharmaceuticals in the Bone Scan dose for DH, are obtained by the radiopharmacy by means of interstate and international commerce. These commercial activities involve the international production and transport of radioactive pharmaceuticals, and components, for patient care and use within Illinois as well as the production and transport of radioactive pharmaceuticals, and components, in U.S. states other than Illinois. The activities concerning the production and transport of patient-grade radioactive pharmaceuticals are regulated in the U.S.A. by the U.S. Food and Drug Administration and the U.S. Nuclear Regulatory Commission under U.S. Congressional authority. Thus, access to the federal Court system should not be denied as is stated in the "Settlement Agreement and General Release". I would not have signed the "Settlement Agreement and General Release" to be denied access to the federal Court system and its Constitutional protections.

60.     The manufacturer of my main Nuclear Medicine equipment is General Electric, GE,

61.     General Electric allows me to freely purchase, service, and dispose of its very expensive Analog equipment. I had done this.

62.     During a conference prior to the hearing before an ALJ, I informed Mr. Igasaki and Dr. Edward Rose, who was a member of the Medical Disciplinary Board, in plain and clear language, that General Electric

had sent a letter to all owners of Analog GE Nuclear Medicine imaging equipment stating that GE would no longer service it.

63.     I also informed Mr. Igasaki and Dr. Rose that I had voluntarily disposed of my Analog GE Nuclear Medicine equipment because GE was no longer servicing it although third party companies were providing such services.

64.     Simple examination of only a few of my patient files by Mr. Igasaki prior to my hearing before an ALJ would have shown that I was no longer doing Analog studies.

65.     There was and is absolutely no harm in using Analog equipment. All GE Analog equipment, such as that for which I had used it, had been approved by the U.S. Food and Drug Administration for the purposes for which I had used it.

66.     For example, if Analog equipment was used, then images would appear directly on "Nuclear Medicine Blue" film, made by Kodak, 3M, and Fuji without any analysis services as had to be done when using digital equipment.

67.     Digital Nuclear Medicine equipment is more expensive, more time-consuming, and requires a much more skilled practitioner. I have those skills by having satisfactorily completed an approved full Nuclear Medicine Residency Program.

68.     Thus, there was no need to prosecute me on any aspect of these items. My GE Analog equipment was gone. Thus, why would I sign an Agreed Order for <u>something I was already doing or had already done?</u> This type of behavior by Mr. Igasaki correlates with what the Panel of three 7th Circuit judges wrote about him in their Opinion in 18-3351 as shown in Exhibits E and F.

69.     The manufacture, availability, and use of GE Nuclear Medicine equipment are nationally regulated by the U.S. Food and Drug Administration, USFDA, under U.S. Congressional authority.

70.     Thus, I have been punished by the "Settlement Agreement and General Release" for voluntarily participating in Nuclear Medicine and related medical activities already accomplished and allowed by U.S. regulatory approval.

71.    Mr. Igasaki filed a Section 1983 lawsuit in the U.S. District Court, Chicago, contesting the job action taken against him by the State of Illinois. See Exhibit G, Line 16.

72.    The decision in Mr. David Igasaki's appeal, 18-3351, to the United States Court of Appeals for the Seventh Circuit was filed by the Appellate Court on February 17, 2021.

73.    I would not have signed the "Settlement and General Release" had I known about the opinion and decision of No. 18-3351 in the U.S. Court of Appeals for the 7th Circuit in affirming the decision in the U.S. District Court against previously terminated David Igasaki. 18-3351 was handed down during February 2021, and I signed the "Settlement and General Release" in my case during April 2021.

74.    Since I am not a lawyer, I do not routinely read U.S. District or Appellate Court cases. I also did not know if Mr. Igasaki had filed any post-trial motions in his U.S. District Court case. During May 2022, I received a monetary payout from the State regarding the Constitutional violations as listed in 16-cv-11157.

75.    I have been destroyed professionally, financially, and personally by items as shown in 16-cv-11157 and 23-cv-00490.

76.    23-cv-00490 includes these Individual Agency Employees as Defendants:

      (a).  David Igasaki, former State Staff Attorney;

      (b).  Laura Forester, former Chief of Medical Prosecutions and Igasaki's supervisor;

      (c).  Mark Thompson, current IDFPR Deputy General Counsel and supervisor of Forester and Igasaki.

77.    Igasaki, Forester, and Thompson are not listed in the "Settlement Agreement and General Release", See Exhibit C, Pages 1 through 4, nor are they Named or Captioned Defendants in my original or amended filed Complaint of 16-cv-11157.

78.    Igasaki, Forester, and Thompson are newly identified malfeasant actors and are new "Individual Agency Defendants" because of the facts, findings, and behaviors listed in 23-cv-00490; the Appellees' own Defense Brief, Doc.33, of 7th Circuit No. 18-3351; and, the Opinion, Doc. 46, of 7th Circuit No. 18-3351.

79.    I understood the "Settlement and General Release" to pertain only to my lawsuit before the

U.S. District Court, namely 16-cv-11157 and the Constitutional issues related to that case, *i.e.,* medical license inactivation without notice or hearing. This is what was before the U.S. Court of Appeals for the 7th Circuit as No. 17-2607 and subsequently resulted in changes in Illinois law in 2019.

80.     Thus, access to the federal Court system should not be denied to me as is stated in the "Settlement Agreement and General Release". I would not have signed the "Settlement Agreement and General Release" to be denied access to the federal Court system and its Constitutional protections.

81.     I would not have signed the "Settlement and General Release" had I known about the opinion and decision of No. 18-3351 in the 7th Circuit in affirming the decision in the U.S. District Court against previously terminated David Igasaki if I had known about the attendant reasons for Mr. Igasaki's termination as delineated by the 7th Circuit in Docs. 33 and 46.

82.     18-3351 was handed down during February 2021. I signed a "Settlement Agreement and General Release" in 16-cv-11157 during April 2021. Since I am not a lawyer, I do not routinely read U.S. Appellate Court cases. I also did not know if Mr. Igasaki filed post-trial motions in his underlying District Court case.

83.     During May 2022, I received a monetary payout from the State regarding the Constitutional violations as listed in 16-cv-11157. But no medical license restoration has occurred. There has been no restitution for years of ongoing wrongdoing by the State against me.

## Count I
### Declaratory Judgment Act

84.     Dr. Phillips incorporates by reference Paragraphs 1-83.

85.     The Declaratory Judgment Act provides that in a case of actual controversy within its jurisdiction, any district court may declare the rights and other legal relations of any interested party seeking such declaration. 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.*

85.     There is an actual controversy sufficient to warrant a declaratory judgment here. Due to the Defendants' wrongful acts, Dr. Phillips has suffered and continues to suffer an injury in fact: financial damages; harm to his personal and professional reputations; and, emotional distress.

86. Dr. Phillips will suffer continued hardship - future financial damages, continued emotional distress, continued harm to his professional and personal reputations - if the Court denies declaratory relief.

87. The public interest favors declaratory relief because government employees should abide by the law, and a previously licensed physician should be able to practice medicine without improper discipline and repeated unilateral meddling with his license.

WHEREFORE, Plaintiff Dr. Phillips prays the Court award:

A. Monetary damages pursuant to 28 U.S.C. § 2202 necessary to effectuate relief;

B. A permanent injunction enjoining the Defendants from engaging in the practices complained of herein;

C. A declaratory judgment that the medical license of Dr. Phillips was incorrectly placed on "Inactive" or "Expired" or "Suspended" or "Revoked" status and thus was never actually "Inactivated" or "Expired" or "Suspended" or "Revoked";

D. The Court retain jurisdiction until it is assured that the Defendants have remedied the practices complained of herein and comply with the law; and,

E. An award of reasonable attorney's fees where applicable, for costs, litigation expenses, and such other relief as the Court deems just.

## Count II
### Violation of 42 U.S.C. § 1983

88. Dr. Phillips incorporates by reference Paragraphs 1-87.

89. The Fourteenth Amendment of the United States Constitution guarantees that no State shall "deprive any person of life, liberty or property without due process of law." U.S. CONST. AMEND. XIV.

90. 42 U.S.C. § 1983 provides: "Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

13

91.     At all relevant times, Defendants Cecilia Abundis, David Igasaki, Laura Forester, Mark Thompson, and Peter M.C. Hofmann, M.D. were employees or agents of the State of Illinois.

92.     At all relevant times, Defendants Cecilia Abundis, David Igasaki, Laura Forester, Mark Thompson, and Peter M.C. Hofmann, M.D. had an obligation and duty to comply with Illinois and federal law when determining whether to impose discipline on a medical practitioner.

93.     Plaintiff Dr. Phillips has at all times possessed a present entitlement to the benefits of his previously-issued medical license which constitutes a protected property interest under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. This includes, but is not limited to Defendant David Igasaki's demands in his original DPR complaint that Dr. Phillips perform certain medical functions illegally contrary to Illinois and federal laws and to Defendant Dr. Peter M.C. Hofmann for not responding to Dr. Phillips's "Letter of Petition" thus suspending and/or revoking Dr. Phillips's medical license and livelihood. See Exhibit A. Dr. Phillips has previously been in contact with the Medical Disciplinary Board of which Dr. Hofmann was chairman.

94.     Nowhere in Defendant Igasaki's original DPR complaint against Dr. Phillips does he state why Dr. Phillips should perform illegal acts. Dr. Phillips used one intravenous injection of a prescription radioactive pharmaceutical to perform one Nuclear Medicine Bone Scan. This is how this a Nuclear Medicine Bone Scan procedure is performed everywhere on this planet. Throughout the U.S.A., the radioactive pharmaceutical used for a Nuclear Medicine Bone Scan is a prescription item and reasons for its use must be obtained. These reasons are obtained by means of a history and physical exam. This is the law. Yet Mr. Igasaki stated that I had wrongfully performed a history and physical exam, and should be disciplined and punished. To whom was Mr, Igasaki listening?: to Dr. Charles Neal who had never practiced Nuclear Medicine a day in his life?

95.     As fact, Dr. Charles Neal as a supposed expert witness of Mr. David Igasaki::

(a)     never completed an approved, full Nuclear Medicine Residency Program;

(b)     never practiced Nuclear Medicine;

(c)     never had his own Nuclear Medicine practice and hence never had the responsibility of

14

obtaining and maintaining his own Radioactive Materials License, RAM;

Was Dr. Neal the kind of witness as stated in the decision of the 7th Circuit in 18-3351, that demonstrated that Mr. Igasaki had shown that he had "a lack of knowledge on how to acquire experts"? See Exhibit F, Lines 25 and 26. Or was Mr. Igasaki preoccupied with bed bugs as was described in the State's own appeal defense brief which is Doc. 33 in No. 18-3351? Mr. Igasaki continued to work on my case, and Mr. Igasaki signed the "Final Order". If Mr. Igasaki did not understand that prescription items require reasons for issuance, obtained by actually seeing the patient and doing a history and physical exam, then other State staff attorneys employed by the IDFPR and working in the Division of Professional Regulation understood this concept perfectly. For example, when "Viagra" was initially released for treatment of erectile dysfunction, many members of the male population were clamoring for the "little blue pill" *i.e.*, Viagra. And, certain licensed medical doctors were calling pharmacies to prescribe Viagra. Those doctors had not performed a history and physical exam on the patient. In fact, they had not seen the patient at all. In Illinois, illegal possession of a prescription drug is a Class 4 Felony punishable by 1 to 3 years in a state penitentiary. Those doctors were disciplined by the DPR. Did Mr. Igasaki understand this in my case? Did Mr. Igasaki understand the necessity for having reasons for writing a prescription, especially for an intravenous injection of a radioactive pharmaceutical? Well, if you read and understand Doc. 33, the State's own Appeal Defense Brief, in 7th Circuit No. 18-3351, you can see that Mr. Igasaki was preoccupied with bed bugs.

96.    Defendant Igasaki's main witness in 16-cv-11157 was Complainant DH. Ms. DH stated in plain and clear language that I had given her pills, in order to perform her Nuclear Medicine Bone Scan. DH stated this twice. In fact, Dr. Charles Neal, another witness of Mr. Igasaki, correctly stated that a Nuclear Medicine Bone Scan cannot be performed by using oral medicine. The Nuclear Medicine Bone Scan medicine must be given intravenously as is done everywhere on this planet, including the U.S.A. and Illinois.. Yet, Mr. Igasaki disregarded this serious misinformation by DH. This was confirmed by Dr. Charles Neal, Mr. Igasaki's own witness, as being misinformation. Mr. Igasaki did not drop his case, but continued it. And yet Mr. Igasaki was enabled to continue the case by Defendants Laura Forester and Mark Thompson. In its Decision in Case No. 18-

3351, Doc. 46, Page 3, Lines 23 through 27, see Exhibit F, of the PACER Edition filed on February 17, 2021, the 7th Circuit stated, "In Igasaki's 2014 performance review, Forester rated him as needing improvement in all categories, explaining among other things, that he demonstrated a lack of knowledge on how to acquire experts, produced low-quality complaints and continued to fall asleep during work hours". DH was an untruthful witness wrongfully testifying on the most fundamental aspect of Mr. Igasaki's own case.

Mr. Igasaki thus:

    A.    introduced falsified or manufactured evidence;

    B.    practiced wrongful concealment of Dr. Phillips's Nuclear Medicine Consultation Report, which was in Mr. Igasaki's possession and which was for and of DH. This Report shows the correct route of medical administration to and for this patient as being intravenous, not oral by pills for producing a Nuclear Medicine Bone Scan;

    C.    withheld documents, *i.e.*, the Nuclear Medicine Consultation Report of DH;

    D.    asserted as facts items which are not in evidence;

    E.    used improper arguments;

    F.    incorrectly vouched for the credibility of a witness;

    G.    mischaracterized evidence;

    H.    by continuing his prosecution, Mr. Igasaki gave credence to wrong, untruthful, and damaging misinformation.

97. The "Screen Shot View", see Exhibit B, heavily redacted by personnel of the State, shows that Defendant Igasaki is the Individual who issued the "Final Order" in his underlying case against me. Dr. Phillips had never seen the "Screen Shot View" until just prior to the deposition of now-Defendant Mark Thompson on August 20, 2020.

98. In failing to reply to Dr. Phillips' s "Letter of Petition", the Defendants failed to accord Dr. Phillips due process of law by not providing him with Notice and a fair and prompt pre-deprivation hearing, including but not limited to a hearing date, place and time, and Notice of the charges leveled against him or otherwise apprising or providing him with an opportunity to be heard, in violation of the Due Process Clause of

the Fourteenth Amendment of the Constitution of the United States.

99.      The acts and omissions of Defendants Cecilia Abundis, David Igasaki, Laura Forester, Mark Thompson, and Peter M.C. Hofmann, M.D. were done with the power and authority vested in them as employees and/or agents of the State of Illinois and constitute violations of the rights of Dr. Arnold G. Phillips under the Fourteenth Amendment of the Constitution of the United States.

100.      Defendants Cecilia Abundis, David Igasaki, Laura Forester, Mark Thompson, and Peter M.C. Hofmann, M.D. committed such acts and omissions intentionally, knowing such acts and omissions violated the Constitutional rights of Dr. Arnold G. Phillips.

101.      The conduct of ignoring the "Letter of Petition" of Dr. Arnold G. Phillips was done by Defendants Peter M.C. Hofmann, M.D., Cecilia Abundis, and Mark Thompson.

102.      The conduct of presenting Dr. Phillips with a "Settlement Agreement and General Release", see Exhibit C, in 16-cv-11157 was knowingly done by and through Defendants Laura Forester and Mark Thompson. Indeed, in his deposition of August 20, 2020, Mr.Thompson stated that he "knew all about Mr. Igasaki".

103.      It is foundational that every citizen has a right of access to the federal Courts. The "Settlement Agreement and General Release" wrongfully denies Dr. Phillips access to the federal Courts.

104.      Yet, 16-cv-11157 was heard in the U.S. District Court, Chicago. Defendant Igasaki's appeal, 18-3351, regarding the dismissal by the U.S. District Court, Chicago, in which Mr. Igasaki contested the State's job action against him, was heard and decided in the U.S. Court of Appeals for the Seventh Circuit as follows: Appellee's Defense Brief, Doc. 33, was filed on August 10, 2020; Oral Argument was heard on November 6, 2020; and, the Opinion and Decision of the 7th Circuit, Doc. 46 in 18-3351, was filed on February 17, 2021. None of the Defendants named and captioned in 23-cv-0049 are named in the "Settlement Agreement and General Release" of 16-cv-11157.

## Count III
### Class of One
### Violation of Equal Protection Provisions of the Fourteenth
### Amendment of the United States Constitution

105.      Dr. Arnold G. Phillips incorporates by reference Paragraphs 88 through 104.

106.    Exhibit D is the "Dispensing Ticket" lawfully issued by Mallinckrodt Radiopharmacy for one, and only one Nuclear Medicine Bone Scan dose. This dose was provided to Dr. Phillips by Mallinckrodt Radiopharmacy for patient use by Dr. Phillips in Illinois although Mallinckrodt operates in many States.

107.    The Mallinckrodt "Dispensing Ticket" is No. 00328022 and dated June 17, 2008. See Exhibit D.

108.    Dr. Phillips could thereby perform one, and only one intravenous Nuclear Medicine Bone Scan test. This is what Dr. Phillips did.

109.    The Nuclear Medicine Consultation Report of Complainant DH was in Mr. David Igasaki's possession.

110.    After performing a "Limited History and Physical Exam", Dr. Phillips intravenously injected the radioactive pharmaceutical into Complainant DH.

111.    In full and complete compliance with federal and State standards and usual and customary practices, Dr. Phillips intravenously injected one dose in the correct dosage amount as so stated in the Nuclear Medicine Consultation Report of Complainant DH, a copy of which was in the possession of Mr. David Igasaki.

112.    Thus, Mr. David Igasaki participated in the:

(a).    Withholding of documentary evidence. The evidence being the necessity of conforming with federal and State laws such as, but not limited to the necessity of performing a history and physical exam as per standard practice before providing a prescription medicine for patient use;

(b).    Misstating or omitting laws and the usual and customary practices of the Division of Professional Regulation such as, but not limited to laws and practices regarding the requirement of having reason(s) for writing a prescription for patient care and patient use, *cf.*, Illinois Medical Practice Act;

(c).    Introducing falsified or manufactured evidence such as, but not limited to requiring "bundling" of services and charges, *e.g.*, "bundling" the history and physical so that the payor cannot see what they are paying for, not allowing for charging for a "Limited

History and Physical Exam" although this involves work and medical decision-making;

(d).    Dr. Phillips states as fact that he has never been denied payment by any insurance company for doing a "Limited History and Physical Exam". Insurance companies want to know what they are paying for. Neither they nor their medical staffs want, or will tolerate any deceptive hidden charges or "bundling".

(e).    Ignoring that Dr. Phillips had already disposed of his Analog GE equipment as per a non-binding GE non-service advisory. Issuance of all such medical equipment notices and directives must first be approved or not approved by the United States FDA;

(f).    Asserting as facts items which are not in evidence. At a pre-hearing conference conducted by Mr. Igasaki, Dr. Phillips stated in plain and clear language that he no longer performed Analog studies because his Analog equipment had been disposed of. Dr. Phillips had provided the DPR with a list of all patients seen by him and the studies performed for each patient. It was thereby obvious that Dr. Phillips was no longer performing Analog studies although these were performed everywhere in the U.S.A. Why would I sign an "Agreed Order" for that which I had already done?

(g).    Using improper arguments. The United States Food and Drug Administration, the federal Agency responsible for medical device oversight, never issued a directive stopping the use of Nuclear Medicine Analog equipment. GE never issued a directive stopping the use of Nuclear Medicine Analog equipment. Thus there was no need to punish or discipline Dr. Phillips for using Nuclear Medicine Analog equipment. Dr. Phillips had disposed of his Nuclear Medicine Analog equipment when GE advised that they had stopped servicing such equipment although many independent third party service providers continued to service Nuclear Medicine Analog equipment;

(h).    Vouching for the credibility of a witness named Dr. Charles Neal. Dr. Neal never ordered radioactive pharmaceuticals for patient use and care under his own name. Dr.

19

Neal never did a history and physical exam for patients on whom he interpreted bone scans. Dr. Neal had never been in private practice. Dr. Neal had never completed an approved full Nuclear Medicine residency program;

    (i).    Interfering with Plaintiff Dr. Phillips's Constitutional rights by irrationally not according Dr. Phillips the same treatment as similarly situated individuals regarding prescription radioactive pharmaceuticals and the use of regulated equipment for patient use and care;

113.    Thus, Dr. Phillips was intentionally treated irrationally, illegally, and with ill-will than similarly situated medical licensees and holders of a Radioactive Materials License, *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

WHEREFORE, Plaintiff Dr. Phillips prays the Court award:

A.    Compensatory damages exceeding $75,000. to compensate Dr. Phillips for the financial damages, irreparable damages to his personal and professional reputations, e.g., but not limited to the malfeasant allegation that Dr. Phillips did more than one test of the same test on the same patient and hence did more than one intravenous injection of a radioactive pharmaceutical, and emotional distress caused by the Defendants as well as having malfeasant practices repeatedly enabled by the Defendants.

B.    Reversal of the "Settlement Agreement and General Release" because of the denial of access to the federal Court system and because of the State's own "Defense Brief" as Doc. 33 in 18-3351 of the 7th Circuit showing a very troubled State staff attorney namely Defendant David Igasaki.

C.    By Defendants Laura Forester and Mark Thompson allowing Mr. Igasaki to continue his activities, Dr. Phillips thereby became Mr. Igasaki's victim.

D.    An award of reasonable attorney's fees where applicable, litigation expenses, and such other relief as the Court deems just.

**JURY DEMAND**

Dr. Phillips demands a trial by jury on all claims for which he is entitled to trial by jury.

Date:
June 15, 2023

Respectfully submitted,

Arnold G. Phillips, M.D.
*pro se*
1420 Madison Drive
Buffalo Grove, IL 60089
phone: 847-913-8913
email: agphil432@gmail.com

# LIST OF EXHIBITS

Exhibit A
    Subject Matter: Letter of Petition to Dr. Peter M.C. Hofmann,
    Number of Pages: 2.

Exhibit B
    Subject Matter: Screen Shot View in 16-cv-11157,
    Number of Pages: 5.

Exhibit C
    Subject Matter: Settlement Agreement and General Release,
    Number of Pages: 4.

Exhibit D
    Subject Matter: Mallinckrodt Radiopharmacy Dispensing Ticket,
    Number of Pages: 1.

Exhibit E
    Subject Matter: Page 2 of Opinion and Decision of 7th Circuit Case No. 18-3351,
    Number of Pages: 1.

Exhibit F
    Subject Matter: Page 3 of Opinion and Decision of 7th Circuit Case No. 18-3351,
    Number of Pages: 1.

Exhibit G
    Subject Matter: Page 4 of Opinion and Decision of 7th Circuit Case No. 18-3351,
    Number of Pages: 1.

Exhibit H
    Subject Matter: H.R. 2617 - 1419 as signed by the President on Dec. 29, 2022 referencing Chapter 3,
    §3621 listed as "Regulation of Certain Products as Drugs" in 21 U.S.C./
        and, 353(h)(1);
        and, 353(h)(2)(A)(i);
        and, 353(h)(2)(A)(ii);
        and, 353(h)(2)(B);
        and 310.3(n).
    Number of Pages: 1.

## Certificate of Compliance

Court No. 23-cv-00490.
Plaintiff: Arnold G. Phillips
Amended Complaint.
Number of Words: 7,181.
Number of Pages: 23.
Computer: IBM/Lenovo ThinkPad.
Operating System: Windows Vista.
Browser: Chrome.
Microsoft Office Word 2007.
Type Style: Times New Roman.
Font Size: 12.
Printer: HP 6970.
Ink: HP 902.

Date:
June 15, 2023

Arnold G. Phillips, M.D.
*pro se*
1420 Madison Drive
Buffalo Grove, IL 60089
phone:  847-913-8913
email:  agphil432@gmail.com

23

October 7, 2022

Peter M.C. Hofmann, M.D.
Chairman
Illinois Medical Disciplinary Board
320 West Washington Street, 3rd Floor
Springfield, IL 62786

Dear Dr. Hofmann:

I am writing to petition the Illinois Medical Disciplinary Board to reactivate my Medical License which is Number 036.076706.

During his Deposition on August 20, 2020, IDFPR Deputy General Counsel Mark Thompson stated that I needed to petition the Illinois Medical Disciplinary Board to reactivate my Medical License.

My Medical License has not been suspended or revoked by the Illinois Medical Disciplinary Board.

Yours truly,

Arnold G. Phillips, M.D.
1420 Madison Drive
Buffalo, Grove, IL 60089
Phone: 847-913-8913

Certified Mail Receipt No. 7019-0140-0000-4951-4067.

Exhibit A   Page 1 of 2

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

PETER M.C. HOFMAN, M.D.
CHAIRMAN
ILLINOIS MEDICAL DISCIPLINARY
320 W WASHINGTON ST, 3rd BOARD
SPRINGFIELD, IL 62786 FLOOR

9590 9402 3508 7275 2994 18

2. Article Number (Transfer from service label)

7019 0140 0000 4951 4067

PS Form 3811, July 2015 PSN 7530-02-000-9053

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:    ☒ No

3. Service Type
☐ Adult Signature                ☐ Priority Mail Express®
☐ Adult Signature Restricted Delivery  ☐ Registered Mail™
☑ Certified Mail®                ☐ Registered Mail Restricted Delivery
☐ Certified Mail Restricted Delivery   ☐ Return Receipt for Merchandise
☐ Collect on Delivery            ☐ Signature Confirmation™
☐ Collect on Delivery Restricted Delivery  ☐ Signature Confirmation Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

Domestic Return Receipt



U.S. Postal Service™
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL

Certified Mail Fee  $4.00
$                    $3.75
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $ $0.00
☐ Certified Mail Restricted Delivery  $ $0.00
☐ Adult Signature Required         $ $0.00
☐ Adult Signature Restricted Delivery $
Postage  $0.60
$
Total Postage and Fees  $ .85
$

Sent To  P M.C. HOFMAN MD, CHAIRMAN, IL, MED. DIS-
Street and Apt. No., or PO Box No.  C/P LINARY BOARD. 320 W. WASHINGTON ST. 3rd FL
City, State, ZIP+4®  SPRINGFIELD, IL 62786

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

VERNON HILLS IL
OCT 2022
60061

Exhibit A   Page 2 of 2

**Case View Screen** [update]

| | |
|---|---|
| Case | 2008-10000 (PUBLIC) |
| Status | ADMINISTRATIVE REVIEW |
| Date Opened | 11/25/2008 |

| | |
|---|---|
| Receiving Board | MEDICAL BOARD |
| Receiving Profession | LICENSED PHYSICIAN AND SURGEON |
| Receiving Department | MD Inv Chief |
| Received By | Karen Schrock |
| How Received | Citizen Complaint Internet |
| Issues | none |

Audit
Entry Items
Billing
Accounts
Case
Documents
Chr. Report
Legacy

Comments:

**Attached Complaints**

| Year - Number | Type | Respondent | Issue | Resolution |
|---|---|---|---|---|
| 2008-10000 | Complaint | Phillips, Arnold Gilbert | POSSIBLE PERFORMED EXCESSIVE AND UNNECESSARY TEST AND POSSIBLE FRAUDULENT BILLING | |

**Other Participants** [add]

Contacts Affiliated with Respondent
Attorney: ALAN RHINE

**Resolution** [update]

| | Resolution |
|---|---|
| | none |

Resolution Notes:

**Action Items** [add] [show disciplines]

| Type | Assigned To | Activity | Due | Effective | Completed | Order Signed | Created ▲ | User |
|---|---|---|---|---|---|---|---|---|

|  | **Target:** | Arnold Gilbert Phillips MD, 036.076706 |  |  |  |  |
| --- | --- | --- | --- | --- | --- | --- |
|  | **Comments:** | DuPage Nuclear Medicine Clinic 710 E. Ogden Avenue Suite 450 Naperville, IL 60563 |  |  |  |  |
| **DISCIPLINE Reason** |  | Public Information Office, TLOndrey | 08/22/2013 | 08/22/2013 | 09/04/2013 | TLOndrey |
|  | **Target:** | Arnold Gilbert Phillips MD, 036.076706 |  |  |  |  |
|  | **Comments:** | because he billed a patient for duplicative imaging that duplicated the same information and billed the patient for a limited history and physical that was incidental to and should have been rolled into the charge for the main bone scan procedure. |  |  |  |  |
| **DISCIPLINE: Fine** |  | Adjudicative Services, TLOndrey | 08/22/2013 | 08/22/2013 | 09/04/2013 | TLOndrey |
|  | **Target:** | Arnold Gilbert Phillips MD, 036.076706 |  |  |  |  |
|  | **Fine:** | Fine Overdue |  |  |  |  |
|  |  | Total Amount | $10,000.00 0010-0093-0036-0900 |  |  |  |
|  |  | Amount Paid | $660.50 |  |  |  |
|  |  | **[details]** |  |  |  |  |
|  | **Fine Warning:** | OUTSTANDING FINE |  |  |  |  |
|  | **Warning:** | Warning Type: | HAS BEEN DISCIPLINED |  |  |  |
|  |  | Warning Effective Date: | 09/04/2013 |  |  |  |
|  | **Comments:** | $10,000 fine due; eff 08/22/2013 |  |  |  |  |
| **DISCIPLINE: Reprimand** |  | Adjudicative Services, TLOndrey | 08/22/2013 | 08/22/2013 | 09/04/2013 | TLOndrey |
|  | **Target:** | Arnold Gilbert Phillips MD, 036.076706 |  |  |  |  |
|  | **Warning:** | Warning Type: | HAS BEEN DISCIPLINED |  |  |  |
|  |  | Warning Effective Date: | 09/04/2013 |  |  |  |
|  | **Comments:** | license reprimanded; eff 08/22/2013 |  |  |  |  |
| **DISCIPLINE: Other** |  | Adjudicative Services, TLOndrey | 08/22/2013 | 08/22/2013 | 09/04/2013 | TLOndrey |
|  | **Target:** | Arnold Gilbert Phillips MD, 036.076706 |  |  |  |  |
|  | **Comments:** | Motion for Rehearing is Denied; eff 08/22/2013 |  |  |  |  |
| **Order Signed By The Director** |  | Adjudicative Services, TLOndrey | 08/22/2013 | 08/22/2013 | 09/04/2013 | TLOndrey |
|  | **Target:** | Arnold Gilbert Phillips MD, 036.076706 |  |  |  |  |
|  | **Case Status:** | Status Changed To: | CLOSED ADJUDICATION COMPLETE |  |  |  |
|  | **Action Info:** | TYPE OF ORDER: | Formal |  |  |  |
|  |  | RESPONSIBLE FOR ORDER: | Igasaki, David |  |  |  |
|  | **Violations:** | DISHONORABLE, UNETHICAL, OR UNPROFESSIONAL CONDUCT, OBTAINING FEE BY FRAUD, DECEIT, OR MISREPRESENTATION |  |  |  |  |



OAG000293



Exhibit B  Page 3 of 5

OAG000294



OAG000295



Exhibit B   Page 5 of 5

OAG000296

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ARNOLD G. PHILLIPS,                          )
                                             )
                    Plaintiff,               )          16 CV 11157
                                             )
        v.                                   )          District Judge Virginia M. Kendall
                                             )
ILLINOIS DEPARTMENT OF FINANCIAL             )          Magistrate Judge Maria Valdez
REGULATION, et al.,                          )
                                             )
                    Defendants.              )

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and General Release ("Agreement") is made and entered into by and between Arnold Phillips ("Plaintiff") and Bryan A. Schneider, Jessica A. Baer, Manuel Flores, Jay Stewart, Jeff Read, Ruth Davis (formerly Ruth Lawson), and Ed Pruitt, ("Defendants"), collectively referred to as "Parties."

## RECITALS

Plaintiff filed the above-captioned lawsuit alleging violations of rights protected by statute(s), regulation(s), common law, the Constitution of the State of Illinois and/or the Constitution of the United States (hereinafter referred to as the "Action").

Defendants deny the allegations and affirmatively state that Plaintiff has failed to state a claim upon which relief can be granted.

To avoid further expense and in recognition of the Parties' position, the Parties wish to settle, compromise and terminate this Action;

## TERMS

The Parties agree to the following:

1.      In consideration for the full and complete settlement of this claim, Plaintiff shall receive $\underline{\$37,000.00}$  ("Settlement Amount") payable from appropriations made to

Exhibit C  Page 1 of 4

1

the Illinois Department of Central Management Services pursuant to 20 ILCS 405/405-105(12). The Settlement Amount shall be made payable to Arnold Phillips and Steven W. Becker of the Law Office of Steven W. Becker, L.L.C. No individual defendant shall be responsible for payment of any sum under this Agreement.

2.      The Parties understand that the Settlement Amount is subject to the availability of funds in the State Treasury and the operations of the State Comptroller's office in processing vouchers for payment and withholding funds that Plaintiff may owe to other persons or to state agencies.  Plaintiff may contest the validity of these claims through applicable state procedures. Plaintiff and his attorneys shall submit W-9 forms and any other documents reasonably requested to effectuate the payment.

3.      The above-tendered consideration is not to be construed as an admission of any liability.

4.      Plaintiff and his heirs, successors, assigns, and all other persons acting on Plaintiff's behalf release and forever discharge Defendant(s) and the State of Illinois, its agencies and their agents, former and present employees, successors, heirs, and assigns and all other persons acting on their behalf from all actions, claims and demands of any kind that arose or could have arisen from the facts alleged or claims made in the Action, whether known or unknown, up to the effective date of this Agreement. Plaintiff and Plaintiff's attorney release, waive, and relinquish any claim or right to attorney fees, costs, or expenses allegedly incurred or due under any statute, rule, or common law provision.

5.      Plaintiff agrees to dismiss the Action with prejudice and without attorney fees, costs, or expenses by submitting a fully executed Stipulation to Dismiss to the Court for entry of an order reflecting said dismissal within 20 days of full execution of this Agreement.

Exhibit C  Page 2 of 4                          2

6.     This Agreement contains the entire agreement between the Parties.  No promise has been made to pay or give Plaintiff any consideration other than as stated in this Agreement.  All the Parties' agreements, covenants, commitments and warranties, express or implied, oral or written, concerning this Agreement's subject matter are contained in this Agreement.

7.     Plaintiff enters into this Agreement as a free and voluntary act with full knowledge of its legal consequences, and in doing so represents and warrants that he has not relied on any information or representation by Defendant(s), their counsel, or other agents, oral or written, that are not contained in this Agreement.

8.     This Agreement shall be construed and interpreted in accordance with the laws of the State of Illinois, without regard to principles of conflict of laws.

9.     This Agreement may not be changed, modified or assigned except by written agreement of Plaintiff, the Illinois Department of Financial and Professional Regulation, and the Illinois Attorney General.

10.     Plaintiff shall not file this Agreement in any court. Plaintiff shall not disclose to anyone the Agreement's terms and conditions or other terms or related particulars discussed in settlement negotiations, except as necessary to enforce Agreement terms or as expressly required by law. On inquiry, Plaintiff and their attorney shall simply state that these matters were settled to the satisfaction of the Parties.

11.     This Agreement shall not be construed to constitute a waiver of sovereign immunity of the State of Illinois or the Illinois Department of Financial and Professional Regulation.

12.     If any provision of this Agreement is declared invalid or unenforceable, the balance of this agreement shall remain in full force and effect.

Exhibit C  Page 3 of 4                    3

13.    This Agreement may be executed in multiple counterparts and shall be deemed effective when executed by all the Parties.

AGREED:

_Arnold L. Phillips_ (signature)                            _April 27, 2021_ (handwritten)
Plaintiff Arnold Phillips                                        Date

_____                     _____
Steven W. Becker                                             Date
Law Office of Steven W. Becker, L.L.C.
Counsel for Plaintiff

_____                     _____
Kelly C. Bauer                                               Date
Assistant Attorney General
Counsel for Defendant(s)

_____                     _____
                                                                   Date
On behalf of the Illinois Department
of Financial and Professional Regulation

_____
Title

Exhibit C   Page 4 of 4



Exhibit D  Page 1 of 1

2                                                    No. 18-3351

# I

## A

Igasaki, a gay, Japanese-American man, suffers from gout. From January 1994 until his termination in March 2015, Igasaki, who was 62-years old at the time of his complaint, worked as a staff attorney in the Medical Prosecutions Unit of the Illinois Department of Financial and Professional Regulation. His responsibilities included preparing for disciplinary proceedings, participating in settlement conferences, and litigating cases at administrative hearings. As part of his employment, Igasaki received periodic performance reviews from his superiors.

In February 2011, Laura Forester became the Department's Chief of Medical Prosecutions and thus responsible for Igasaki's performance reviews. Forester gave Igasaki a good performance review in 2011 and rated him as either exceeding or meeting expectations in all categories. But in 2012, Forester rated Igasaki poorly, describing him as requiring improvement in "job knowledge," "productivity," "quality," "initiative," "use of time," "planning," and "follow-up." Forester also provided specific examples of Igasaki's deficient performance, including that he could not be located during work hours and his work product was poor. This began three years of Igasaki receiving poor performance reviews.

In February 2013, the Department placed Igasaki on a six-month corrective action plan as a result of his 2012 performance review. That plan included twelve requirements for improvement and warned that failure to adhere to these requirements could result in discipline. In August 2013, the Department renewed Igasaki's correction action plan for six

months. Later that month, Igasaki received an oral reprimand for "unsatisfactory performance" and "incompetence or inefficiency in the performance of an assigned duty." He then received a written reprimand for incompetence and inefficiency in December 2013. In Igasaki's 2013 performance review, Forester again rated him poorly and noted that he had fallen asleep during a meeting.

Igasaki fared no better in 2014. In February of that year, the Department renewed Igasaki's corrective action plan for another six months. Igasaki made limited progress on seven of the twelve requirements, but five requirements remained unfulfilled. His corrective action plan listed specific examples of deficiencies: failure to meet 50 deadlines from August 2013 to February 2014; continued sleeping while at work; a disorganized cubicle that led to problems finding files; and a lack of preparation for administrative proceedings. In June 2014, the Department placed Igasaki on a ten-day suspension for incompetence and inefficiency.

In September 2014, the Department yet again renewed Igasaki's corrective action plan with the same twelve improvement requirements, but this time only for five months. That October, Igasaki received another ten-day suspension for insubordination. In Igasaki's 2014 performance review, Forester rated him as needing improvement in all categories, explaining among other things that he demonstrated a lack of knowledge on how to acquire experts, produced low-quality complaints, and continued to fall asleep during work hours. In January 2015, Forester provided feedback on Igasaki's corrective action plan and noted that he had not progressed on six of the twelve requirements.

Exhibit F   Page 1 of 1

That same month, for the first time, Igasaki formally requested accommodation for his gout. As a result of that condition, coworkers had begun pushing Igasaki around the office in a mobile office chair more than three years earlier. When Forester witnessed this firsthand, she informed Igasaki that he could request reasonable accommodation if he needed it. Igasaki took nearly four years to make that request. After finally doing so in January 2015, Igasaki requested an ergonomic keyboard and flexible deadlines. The Department granted Igasaki an ergonomic keyboard, a tape recorder, and authorization for an administrative assistant to type up his written work product. Igasaki's request for flexible deadlines was not supported by a doctor's note, so the Department denied that request.

Instead of renewing Igasaki's corrective action plan for a fifth time, the Department terminated him in March 2015. Before his termination, however, Igasaki filed a discrimination charge against the Department with both the Illinois Department of Human Rights in September 2014 and the Equal Employment Opportunity Commission ("EEOC") in January 2015.

**B**

Igasaki eventually sued the Department over his termination. In his amended complaint, Igasaki alleged five claims: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.*, arising from the Department's treatment of his job performance and termination; (2) sex discrimination in violation of Title VII, arising from gender stereotyping and a hostile work environment based on his homosexuality; (3) age discrimination in violation of the Age Discrimination in Employment Act

H. R. 2617—1419

related to conditions observed by the Secretary during an inspection, to the time at which the Secretary concludes that corrective actions to resolve such conditions have been taken.

"(4) The number of facilities that failed to implement adequate corrective or preventive actions following a report issued pursuant to such section 704(b), resulting in a withhold recommendation for an application under review, including the number of such facilities manufacturing each category of drugs listed in subparagraphs (A) through (C) of paragraph (1).".

## CHAPTER 3—MISCELLANEOUS

### SEC. 3621. REGULATION OF CERTAIN PRODUCTS AS DRUGS.

Section 503 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 353) is amended by adding at the end the following:

"(h)(1) Any contrast agent, radioactive drug, or OTC monograph drug shall be deemed to be a drug under section 201(g) and not a device under section 201(h).

"(2) For purposes of this subsection:

"(A) The term 'contrast agent' means an article that is intended for use in conjunction with a medical imaging device, and—

"(i) is a diagnostic radiopharmaceutical, as defined in sections 315.2 and 601.31 of title 21, Code of Federal Regulations (or any successor regulations); or

"(ii) is a diagnostic agent that improves the visualization of structure or function within the body by increasing the relative difference in signal intensity within the target tissue, structure, or fluid.

"(B) The term 'radioactive drug' has the meaning given such term in section 310.3(n) of title 21, Code of Federal Regulations (or any successor regulations), except that such term does not include—

"(i) an implant or article similar to an implant;

"(ii) an article that applies radiation from outside of the body; or

"(iii) the radiation source of an article described in clause (i) or (ii).

"(C) The term 'OTC monograph drug' has the meaning given such term in section 744L.

"(3) Nothing in this subsection shall be construed as allowing for the classification of a product as a drug (as defined in section 201(g)) if such product—

"(A) is not described in paragraph (1); and

"(B) meets the definition of a device under section 201(h), unless another provision of this Act otherwise indicates a different classification.

"(4) The Secretary shall waive the application fee under sections 736 and 744B for applications for drugs that are—

"(A) on the date of enactment of the Prescription Drug User Fee Amendments of 2022, legally marketed as devices; and

"(B) deemed drugs pursuant to paragraph (1)".

Exhibit H  Page 1 of 1